ACME DIE CASTING, A DIVISION OF LOVEJOY INDUSTRIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD.

No. 93–1163.

United States Court of Appeals, District of Columbia Circuit.

Argued April 14, 1994.

Decided June 17, 1994.

Christopher A. Johlie, Chicago, IL, argued the cause, for petitioner. Also appearing on the briefs was Larry G. Hall, Chicago, IL.

William A. Baudler, Attorney, N.L.R.B., Washington, DC, argued the cause, for respondent. Also appearing on the brief were Linda Scher, Acting Associate Gen. Counsel, and Aileen A. Armstrong and Paul J. Spielberg, Deputy Associate Gen. Counsels, N.L.R.B., Washington, DC.

Howard E. Perlstein, Washington, DC, entered an appearance, for N.L.R.B.

Before: MIKVA, Chief Judge, BUCKLEY and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Acme Die Casting, a Division of Lovejoy Industries, Inc. ("Acme"), seeks to overturn an order of the National Labor Relations Board ("NLRB" or "Board"), finding that Acme committed unfair labor practices under §§ 8(a)(5), (3), and (1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(5), (3), (1). The Board found that Acme's failure to grant across-the-board wage increases to its employees in 1988 violated §§ 8(a)(5), (3), and (1), because it constituted a deviation from ordinary practice without bargaining, and because its purpose was to discourage union membership. The Board also found that Acme violated §§ 8(a)(5) and (1) when it changed its Saturday work schedule without bargaining. Acme responds that neither of these practices was a fixed condition of employment prior to union certification; therefore it was entitled to deny the wage increases and to implement the revised Saturday schedule. Acme also argues that the evidence of anti-union motivation before the NLRB was insufficient to support the Board's finding of a § 8(a)(3) violation. We enforce the Board's order in part and remand in part.

## I. Background

Acme Die Casting operates a plant in Northbrook, Illinois. On October 16, 1987, a representation election among Acme's production and maintenance workers resulted in a victory for the United Electrical, Radio, and Machine Workers of America ("Union"). Acme filed objections to the election, and the Board overruled those objections. In a further effort to challenge the Union's representative status, Acme then refused to bargain. On August 31, 1988, the Board rejected this challenge and found that Acme's refusal to bargain violated §§ 8(a)(5) and (1) of the NLRA. *Acme Die Casting*, 290 N.L.R.B. No. 127 (1988). The Seventh Circuit enforced this decision on June 14, 1990. *NLRB v. Lovejoy Industries, Inc.*, 904 F.2d 397 (7th Cir.1990).

### A. Alleged Unfair Labor Practices

While the above proceedings were pending, the events at issue in this case transpired. Acme at all relevant times refused to bargain with the Union, despite the latter's request. Acme made several unilateral changes in its workplace practices after the Union was elected. For example, prior to the election, employees had been allowed to leave work five minutes before the end of their shifts to start their cars in cold weather, or to warm up food before lunch, or to retrieve food and beverages to bring back to their work stations. After the election, Acme served notice that these practices would be discontinued. Acme also issued numerous written warnings to pro-union employees for engaging in activities that would not have resulted in such discipline prior to the election. An Administrative Law Judge ("ALJ") and the Board subsequently found that the company's actions constituted unilateral changes in the terms and conditions of employment without bargaining, in violation of NLRA §§ 8(a)(5), (3), and (1). However, the ALJ and the Board rejected the Union's claims with respect to other alleged unilateral changes. In this Court, no one challenges the above findings. At issue in this petition are two other alleged deviations from past practice: Acme's refusal to grant wage increases, and its revision of the Saturday work schedule.

### 1. Wage increases.

Prior to the election, Acme had granted wage increases to its employees on the following dates:

January 4, 1980

June 2, 1980

January 5, 1981

June 1, 1981

November 9, 1981

January 4, 1982

September 13, 1982

March 21, 1983

October 17, 1983

April 30, 1984

November 5, 1984

May 12, 1985

December 2, 1985

June 30, 1986

February 16, 1987

September 28, 1987

The election occurred on October 16, 1987; the next wage increase was not until January 2, 1989. All increases (including the 1989 one) were across-the-board, with every employee's salary raised by the same amount— with one exception, the September 1987 raise. This raise represented an attempt to equalize salaries among employees. Every employee received some raise in September 1987, but the amounts varied widely. The amounts of the across-the-board raises had varied from increase to increase, but all had fallen in a range between approximately 15 cents/hour and 30 cents/hour, with most falling at 20–25 cents/hour.

Until late February 1987, Leroy Hagner was Acme's President. Mr. Hagner had been responsible for implementing the wage increases during his tenure. Robert Novak took over as President in February 1987, and he was responsible for the wage-equalization package in September 1987. At the hearing before the ALJ, Mr. Novak testified that as of September 1987 he had no specific plans for a subsequent wage increase. According to Mr. Novak's testimony, Acme's financial picture had become bleak, preventing even management employees from receiving across-the-board increases in 1987 or 1988. Beginning in August 1988, Mr. Novak testified, he began working on a wage increase package, in part because he believed workers were leaving the plant due to low pay. Tony Girone, the President of Lovejoy Industries (which owns Acme), rejected a September 7, 1988 proposal for a wage increase, allegedly because of low profits. According to Mr. Novak's testimony, and a dated letter, Mr. Girone finally approved the 1989 wage increase in mid-November 1988.

As these events occurred, employees had been requesting a wage increase. On March 17, 1988, five and one-half months after the most recent pay increase, a large group of pro-union employees met with Plant Manager Peter Balma to request a raise. Mr. Balma, in accordance with a written guideline prepared by Acme's attorneys, responded that he was unable to grant an increase because of pending litigation with the Union. On April 14, 1988, two Union activists met with Mr. Balma and Mr. Novak to request a pay increase, and they received the same response. On May 2, a larger group of pro-union employees confronted the two supervisors with their request. Mr. Novak responded, "I told you guys not to bother with the Union because that was going to happen, no raise." He then added, "You want the Union, go to the Union."

On December 5, 1988 (after Mr. Novak claims that the January wage increase was approved, but before it was announced), a group of *anti-union* employees met with Mr. Novak and Mr. Balma to request a wage increase. These employees explained that they intended to seek decertification of the Union. Mr. Novak and Mr. Balma responded that they could not get involved in such an effort; but Mr. Novak promised to speak to the owner of Lovejoy Industries about a pay increase. Although Mr. Novak subsequently testified that Mr. Girone had already approved the increase in mid-November, he did not so inform the anti-union employees at this December 5 meeting. On December 16, the company announced the January pay raise, of 30 cents/hour across-the-board.

## 2. Saturday schedule.

Prior to the election, Acme had a fairly well-defined Saturday work schedule: a six-hour shift, beginning at 6:00 a.m., with a 20–minute break. Not all departments worked every Saturday, but those that did followed this schedule. Mr. Novak testified that employees occasionally worked beyond six hours

to complete an assignment, and that "[t]here could have been times" when they were scheduled to work fewer than six hours. He maintained that Saturday work was not part of Acme's normal work week but was scheduled on an as-needed basis. After the election, in January 1988, Acme changed the Saturday overtime schedule to five hours, beginning at 7:00 a.m., and cut the break time in half, to ten minutes.

## B. ALJ and NLRB Findings Below

On May 23, 1991, after a 26–day hearing in Chicago, an ALJ issued a 192–page opinion finding that Acme committed unfair labor practices in violation of §§ 8(a)(5) and (1) by making unilateral changes in the terms and conditions of employment—including the failure to raise wages and the changes to the Saturday work schedule. With respect to the wage increases, the ALJ also found that Acme violated §§ 8(a)(3) and (1) because its failure to raise wages was motivated by anti-union animus. He ordered Acme to institute two retroactive across-the-board wage increases of 25 cents/hour, with interest dating from February and July 1988.

On December 16, 1992, the Board affirmed the above findings of the ALJ and ordered Acme to bargain in good faith with the Union. But the Board modified the remedy: although it agreed with the ALJ that the two increases were owed, the NLRB found that the amount of the increases was uncertain and deferred that issue to the compliance stage of the proceeding.

## II. Discussion

■ Acme requests review of three NLRB findings: that Acme's failure to grant wage increases between September 1987 and January 1989 violated NLRA §§ 8(a)(5) and (1); that this failure was motivated by anti-union animus, in violation of §§ 8(a)(3) and (1); and that the revised Saturday schedule violated §§ 8(a)(5) and (1). The law is clear that we sustain the Board's factual findings if substantial evidence exists in the record to support them. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We uphold the Board's application of the NLRA to those facts unless

arbitrary or otherwise contrary to law. *United Food & Commercial Workers International Union, AFL–CIO, Local 150–A v. N.L.R.B.*, 880 F.2d 1422, 1429 (D.C.Cir.1989). In deciding whether the Board's decision was arbitrary, we may consider only those facts actually presented before the Board. *See Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

## A. Withholding Wage Increases as Unilateral Change

■ Acme's failure to increase wages violated § 8(a)(5) (and thus also § 8(a)(1)) if it constituted a unilateral change in the terms and conditions of employment. 29 U.S.C. § 158(a)(5). There is no question that the decision was unilateral: Acme flatly refused to bargain with the Union about wage increases or anything else. The question is, was the decision not to raise wages a "change"—that is, was it a deviation from accepted prior practice, and from the expectations of Acme's employees, as things stood prior to the election? *See N.L.R.B. v. Katz*, 369 U.S. 736, 746–47, 82 S.Ct. 1107, 1113–14, 8 L.Ed.2d 230 (1962). The ALJ and the Board found that semiannual, across-the-board wage increases of between 15 and 30 cents/hour were the norm. Therefore, Acme's failure to grant any increases for a period in excess of fifteen months represented a deviation from prior accepted practice— a change in the terms and conditions of employment, over which the company was obliged to bargain.

Acme challenges this finding. It argues that the wage increases were at all times discretionary, as demonstrated by their varying dates and amounts. If, as Acme claims, the increases were discretionary, then withholding them did not constitute a change; and indeed, had Acme *granted* an increase unilaterally it would have committed an unfair labor practice. *See Specialty Steel Treating, Inc.*, 279 N.L.R.B. 670 (1986) (unilaterally implementing discretionary wage increase violates § 8(a)(5)); *Katz*, 369 U.S. 736, 82 S.Ct. 1107 (same).

In a recent case, we found that NLRB precedent provides no clear standard for determining whether a wage increase that is

consistent as to timing but discretionary as to amount must be continued. *Daily News of Los Angeles v. N.L.R.B.*, 979 F.2d 1571 (D.C.Cir.1992). Accordingly, we remanded *Daily News* to the Board for a clearer explanation. To date, the Board has not acted upon our remand.

We think the same confusion exists in this case. The Board has not demonstrated a comprehensible standard for deciding whether a pattern of increases is sufficiently consistent in timing and/or amount to constitute a settled practice, and so must be granted, or whether such a pattern is discretionary, and so must be put on hold or subjected to bargaining. Indeed, the Board's precedent is all over the map when it comes to making this distinction. *See, e.g., Guy Gannett Publishing Co.*, 295 N.L.R.B. 376 (1989) (annual wage increases in January or February are non-discretionary); *General Motors Acceptance Corp.*, 196 N.L.R.B. 137 (1972), *enf'd*, 476 F.2d 850 (1st Cir.1973) (annual merit-based increases are non-discretionary); *Orval Kent Food Co.*, 278 N.L.R.B. 402 (1986) (irregular merit-based wage increases are discretionary); *Ithaca Journal–News, Inc.*, 259 N.L.R.B. 394 (1981) (same); *American Mirror Co.*, 269 N.L.R.B. 1091 (1984) (irregular across-the-board increases are discretionary); *Anaconda Ericcson, Inc.*, 261 N.L.R.B. 831 (1982) (regular wage increases uncertain as to amount are discretionary); *Oneita Knitting Mills, Inc.*, 205 N.L.R.B. 500 (1973) (same); *Great Atlantic & Pacific Tea Co.*, 192 N.L.R.B. 645 (1971), *enf'd*, 463 F.2d 184 (5th Cir.1972) (increases given in the spring in previous years did not establish a settled practice).

We are aware that *Daily News* may be distinguishable from this case. For example, that case involved merit-based increases, granted only to selected employees, rather than the across-the-board increases at issue here. But it is not our role at this stage to decide whether that distinction—or any other—should make a difference. The Board's new standard may treat merit-based raises differently than across-the-board increases, or it may not. The NLRA is ambiguous, so under *Chevron* we will be bound to accept any reasonable rule that the Board selects as an appropriate gap-filling measure. *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). But the Board must select the rule. We think it incumbent on the Board to set the parameters governing when the frequency and the amount of wage increases is sufficiently consistent to constitute a settled practice under § 8(a)(5). Accordingly, we will remand this portion of the present case to the Board to resolve in light of whatever rule it chooses to adopt in compliance with our decision in *Daily News*.

## B. Withholding Wage Increases as Discriminatory Conduct

■ Irrespective of whether the failure to increase wages constituted a § 8(a)(5) violation, it constituted a *§ 8(a)(3)* violation if Acme's decision was motivated by anti-union animus, a discriminatory desire to discourage union membership. 29 U.S.C. § 158(a)(3). Although Acme argues that no § 8(a)(3) violation may arise from failure to implement a discretionary wage increase, the cases it cites do not support its argument. *See Orval Kent Food Co.*, 278 N.L.R.B. 402 (1981); *Ithaca Journal–News, Inc.*, 259 N.L.R.B. 394 (1981). Instead, these cases hold only that no § 8(a)(3) violation occurs when a denial of increases results from the failure of the company and the union to reach an agreement concerning wage increases during good-faith bargaining. Where the denial arises from anti-union animus, the company has violated §§ 8(a)(3) and (1).

Acme next contends that the decision not to raise wages in 1988 was prompted by low profits, not anti-union animus. It explains the January 1989 wage increase as a response to the difficulty of attracting new employees, and not an effort to accommodate anti-union employees. The Supreme Court has adopted a test for mixed-motive cases that requires the Board's General Counsel to make a prima facie case that discrimination was a substantial or motivating factor in the decision. If the General Counsel makes his case, the burden shifts to the employer to show that the same decision would have been made for a legitimate reason, regardless of

the anti-union motivation. *N.L.R.B. v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), *approving Wright Line*, 251 N.L.R.B. 1083 (1980), *enf'd*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982).

The ALJ held, and the Board agreed, that the General Counsel had made out a prima facie case of discrimination and that Acme had failed to rebut successfully. The ALJ described the prima facie case as consisting of the following facts: (1) the timing of the last wage increase, just before the Union's election, and the lack of any increase for over fifteen months thereafter; (2) Mr. Balma's statement to the pro-union workers that a raise could not be granted because of pending litigation with the Union—not because of low profits, as Acme now claims; and (3) the much more favorable treatment received by the anti-union workers when they requested a raise, and the timing of the 1989 raise soon after that meeting. To these factors, we may add the ALJ's other findings: (4) Mr. Novak's admonition to the pro-union workers that he had told them "not to bother with the Union because that was going to happen, no raise," and his statement, "You want the Union, go to the Union"; and (5) the background evidence of Acme's hostility to the Union, in the form of the numerous unilateral changes that Acme does not challenge here. *See supra*, page 3.

We think this evidence is more than sufficient to support the ALJ's finding that anti-union sentiment was a substantial or motivating factor in Acme's decision to defer wage increases. The facts are readily susceptible to the interpretation that Acme withheld the increases to punish its employees for electing the Union. Because there is substantial evidence in the record to support the Board's finding of fact, we are bound by the NLRB's decision. *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Some of the supporting evidence is ambiguous as to Acme's motivation, and some might be consistent with a finding that Acme believed—perhaps correctly, depending on the Board's resolution of the § 8(a)(5) issue on remand—that it had to withhold the increases because they were discretionary and it could not grant them without bargaining. *See General Motors Acceptance Corp. v. N.L.R.B.*, 476 F.2d 850, 854 (1st Cir.1973) ("[I]f [suspension of wage increases] represented merely a good faith attempt ... to comply with ... *Katz*, we would be reluctant to find a violation of the Act"). But Acme did not rely on this argument before the Board; instead, it claimed low profits as the reason for the withheld wage increases. We cannot overturn the Board's decision based on a possible alternative motivation that the company did not claim below. When the record is sufficient to support the Board's findings, it is not for a reviewing court to reorder or recharacterize the evidence presented.

Acme contests the ALJ's finding that the anti-union workers received preferential treatment because that finding relies in part upon the ALJ's disbelief of Mr. Novak's testimony that the decision to grant the raise was made before the meeting with the workers. Specifically, the ALJ found that Mr. Novak was lying about the date on which Mr. Girone had approved the 1989 wage increase; he also found that Mr. Novak had fraudulently backdated the letter of authorization. Acme argues that this finding lacks substantial evidence because there was no direct evidence in the record to contradict Mr. Novak's testimony. *Cf. Roper Corp. v. N.L.R.B.*, 712 F.2d 306, 310 (7th Cir.1983). We are troubled by the finding that Mr. Novak fraudulently backdated the letter; it rests on flimsy evidence. But our concern does not affect our disposition of this case because this finding was unnecessary to the ALJ's decision that Acme violated § 8(a)(3). The ALJ found, and Mr. Novak did not deny, that Mr. Novak was willing to meet with the anti-union employees and that he promised them that he would speak to the owner about a pay increase. These facts are sufficient to establish disparate treatment. When added to the ALJ's other findings—Mr. Novak's and Mr. Balma's statements, and the background evidence of hostility to the Union— such disparate treatment fully supports the finding of anti-union animus.

The ALJ and NLRB also properly rejected Acme's defense of low profits. First, the ALJ found that profits were higher during the period when Acme refused to increase salaries than during earlier periods (and one later period—January 1989) when Acme did grant increases. Second, the ALJ noted that when Mr. Novak and Mr. Balma were confronted by pro-union employees in 1988 they had explained the failure to increase wages by reference, not to low profits, but to the pending litigation with the Union. We think the Board reasonably found that the increase would have been granted sooner had it not been for Acme's anti-union animus. We therefore deny the petition for review with respect to the § 8(a)(3) violation arising from Acme's failure to grant wage increases in 1988.

## C. The Saturday Work Schedule

█ The ALJ found as a matter of fact, supported by substantial evidence, that prior to the election most of Acme's employees worked most Saturdays, and that whenever an employee worked on Saturday the established schedule was a six-hour workday, beginning at 6:00 a.m., with a 20–minute break. Clearly, the company altered the terms and conditions of employment when it changed its regular Saturday schedule to a five-hour day beginning at 7:00 a.m. and cut the break time in half to 10 minutes. Acme argues that these changes were not changes because they might have resulted only in a greater number of employees working fewer hours. That is irrelevant to the issue at hand. The aggregate number of employee hours worked may be all that concerns the company; but it matters to an individual employee when his employer halves his break time and deducts an hour from his overtime schedule. The new schedule made a difference to the employees subject to it, and the employees were entitled to bargain about the changes through their duly elected representatives. *See, e.g., Venture Packaging, Inc.,* 294 N.L.R.B. 544, 556–57 (1989), *enf'd,* 136 L.R.R.M. (BNA) 2272 (6th Cir.1991) (hours of employment are mandatory subjects of bargaining.). The Board reasonably found that the new hours were a deviation from, not "comprehended within," past practice.

*Cf. Chef's Pantry, Inc.,* 274 N.L.R.B. 775, 776 (1985). We therefore uphold the Board's determination that Acme violated §§ 8(a)(5) and (1) by unilaterally changing the Saturday work schedule.

## III. Conclusion

We uphold the Board's finding that Acme committed unfair labor practices under NLRA §§ 8(a)(3) and (1) by discrimination in regard to the timing of wage increases. We also uphold the finding that Acme violated §§ 8(a)(5) and (1) by unilaterally changing its Saturday work schedule. We remand to the Board, consistent with our prior opinion in *Daily News of Los Angeles v. N.L.R.B.,* 979 F.2d 1571 (D.C.Cir.1992), to formulate a clearer standard for determining when granting or withholding a wage increase violates §§ 8(a)(5) and (1). The Board needs to set comprehensible rules as to when the frequency and quantity of wage increases constitute a settled practice that the employer must continue.

*It is so ordered.*