ACME DIE CASTING, A DIVISION OF LOVEJOY INDUSTRIES, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 95–1418.

United States Court of Appeals, District of Columbia Circuit.

Argued May 10, 1996.

Decided Aug. 27, 1996.

Christopher A. Johlie, Chicago, IL, with whom Larry G. Hall was on the briefs, argued the cause for petitioner.

Paul J. Spielberg, Deputy Assistant General Counsel, National Labor Relations Board ("NLRB"), with whom Linda R. Sher, Associate General Counsel, and Aileen A. Armstrong, Deputy Associate General Counsel, NLRB, were on the brief, argued the cause for respondent. William A. Baudler, Attorney, NLRB, entered an appearance.

Before WALD, BUCKLEY, and SENTELLE, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

Dissenting opinion filed by Circuit Judge WALD.

BUCKLEY, Circuit Judge:

The National Labor Relations Board ("NLRB" or "Board") found that Acme Die Casting, a division of Lovejoy Industries, Inc. ("Company"), committed various unfair labor practices in violation of sections 8(a)(1), (3), and (5) of the National Labor Relations Act ("Act"). When the case first came before us, we affirmed the Board's decision and order in all respects but one; namely, its conclusion that the Company's failure to grant its employees wage increases in 1988 constituted a unilateral change in the terms and conditions of employment in violation of section 8(a)(5). We remanded that question with the request that the Board formulate a rule indicating when a pattern of wage increases is sufficiently regular in timing and amount to constitute a settled employment practice. On remand, the Board merely reiterated its earlier conclusion and made no attempt to comply with our instructions. Because a resolution of this particular question will have no material effect on the remedies the Board has petitioned us to enforce, we will not remand a second time. Rather, we throw up our judicial hands and will enforce the Board's remedial order only with respect to

those findings of unfair labor practices that we have already affirmed.

## I. BACKGROUND

The facts relevant to this appeal are set forth in our previous opinion, *Acme Die Casting, A Division of Lovejoy Industries, Inc. v. NLRB*, 26 F.3d 162, 163–65 (D.C.Cir.1994) ("*Acme I*"). Briefly, during the period from January 1980 through February 1987, the Company granted its employees across-the-board wage increases as follows:

| | | |
|---|---|---|
| January 4, 1980 | - | 20 cents |
| June 2, 1980 | - | 20 cents |
| January 5, 1981 | - | 23 cents |
| June 1, 1981 | - | 25 cents |
| November 9, 1981 | - | 22 cents |
| January 4, 1982 | - | 30 cents |
| September 13, 1982 | - | 25 cents |
| March 21, 1983 | - | 25 cents |
| October 17, 1983 | - | 25 cents |
| April 30, 1984 | - | 25 cents |
| November 5, 1984 | - | 25 cents |
| May 12, 1985 | - | 20 cents |
| December 2, 1985 | - | 25 cents |
| June 30, 1986 | - | 20 cents |
| February 16, 1987 | - | 15 cents |

On September 28, 1987, it granted raises ranging between 10 cents and 40 cents an hour, which were intended to equalize salaries among the employees.

In October 1987, the Company's production and maintenance workers elected the United Electrical, Radio, and Machine Workers of America ("Union") to be their bargaining agent. Despite numerous complaints from its employees, the Company did not give any wage increases in 1988. On January 2, 1989, the Company awarded an across-the-board increase of 30 cents.

In 1992, the Board found that the Company had committed a number of unfair labor practices, *Acme Die Casting, a Division of Lovejoy Industries, Inc.*, 309 N.L.R.B. 1085, 1992 WL 394655 (1992) ("Initial Decision"), two of which were related to the Company's failure to grant wage increases in 1988. The Board concluded that this failure represented a unilateral change in the terms and conditions of employment without affording the Union an opportunity to negotiate, in violation of section 8(a)(5), and that it was motivated by anti-union animus, in violation of section 8(a)(3). *Id.* at 1086, 1159–60.

In *Acme*, we affirmed the Board's findings as to all but one of the violations that it identified. We withheld judgment on whether the Company's failure to grant wage increases in 1988 represented a departure from a settled practice without bargaining, in violation of section 8(a)(5), noting that the Board's past cases had failed to clarify when the timing and amount of the increases is sufficiently consistent to constitute a "settled practice." 26 F.3d at 166. Accordingly, we remanded with instructions that the Board "formulate a clearer standard for determining when granting or withholding a wage increase violates ... § 8(a)(5)," and observed that "[t]he Board needs to set comprehensible rules as to when the frequency and quantity of wage increases constitute a settled practice that the employer must continue." *Id.* at 168.

In a two-page supplemental decision and order on remand, the Board reiterated the facts we have just related and repeated its conclusion that the Company's wage increases from 1980 through 1987 were sufficiently regular in timing and amount to constitute a settled practice. *Acme Die Casting, Division of Lovejoy Industries, Inc.*, 317 N.L.R.B. 1353, 1995 WL 451933 (1995) ("Supplemental Decision"). Accordingly, the Board reaffirmed its "previous finding that [Acme] violated Section 8(a)(5) by failing to give wage increases in 1988 without providing the Union prior notice and an opportunity to bargain." *Id.* at 1354.

## II. DISCUSSION

### A. Settled Practice

Section 8(a)(5) of the Act provides that "[i]t shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees," 29 U.S.C. § 158(a)(5); and section 8(d) identifies the subject matters of such bargaining as including "wages, hours, and other terms and conditions of employment." *Id.* § 8(d). An employer violates the Act when it unilaterally alters wages or other terms or conditions of employment without first negotiating with the union representing the employees. *NLRB v. Katz*, 369 U.S. 736, 743,

82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). Here, it is undisputed that the Company did not bargain with the Union when it refused to grant wage increases in 1988. Thus, the critical inquiry is whether these increases were granted pursuant to Acme's "terms and conditions of employment."

The 1980–1987 wage increases fall within the ambit of section 8(a)(5) " 'if they are of such a fixed nature and have been paid over a sufficient length of time to have become a reasonable expectation of the employees and, therefore, part of their anticipated remuneration.'" *Phelps Dodge Mining Co., Tyrone Branch v. NLRB,* 22 F.3d 1493, 1496 (10th Cir.1994) (quoting *NLRB v. Nello Pistoresi & Son, Inc.,* 500 F.2d 399, 400 (9th Cir.1974)). On the other hand, if an employer "retain[s] total discretion to grant [wage] increases based on any factors it cho[oses], we doubt that discontinuing the policy [will result] in a violation of section 8(a)(5)." *Daily News of Los Angeles v. NLRB,* 73 F.3d 406, 412 n. 3 (D.C.Cir.1996). Indeed, wage increases that "are fixed as to timing but discretionary in amount do not become part of the employees' reasonable expectations and thus are not considered 'terms and conditions' of employment." *Phelps Dodge,* 22 F.3d at 1496. *See also Daily News,* 73 F.3d at 412 n. 3 ("we do not believe that fixed timing alone would be sufficient to bring the program under *Katz*").

In its Initial Decision, the Board adopted the finding of the administrative law judge ("ALJ") that the wage increases awarded Acme's employees were sufficiently regular in timing and amount to constitute a settled practice within the ambit of section 8(a)(5). 309 N.L.R.B. at 1160. The ALJ acknowledged, however, that the case "approache[d] the borderline" between a settled practice and a sporadic one. *Id.* The Company maintained before the Board, and continues to maintain, that the wage increases were not automatic, but discretionary, as evidenced by their varying dates and amounts.

In *Acme,* we found it impossible to resolve this dispute. "The Board," we stated, "has not demonstrated a comprehensible standard for deciding whether a pattern of increases is sufficiently consistent in timing and/or amount to constitute a settled practice." 26 F.3d at 166. Observing that its precedent on this issue was "all over the map," we remanded to allow the Board to craft a rule that "set the parameters governing when the frequency and the amount of wage increases is sufficiently consistent to constitute a settled practice under § 8(a)(5)." *Id.* We noted that any reasonable rule adopted by the Board would, under the familiar principles of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), be afforded deference. We now review the Board's Supplemental Decision to determine whether it has complied with our instruction to formulate a satisfactory standard.

In the introductory section of the Supplemental Decision, the Board quotes that section of our *Acme* opinion in which we noted that the Board had failed to establish a rule. 317 N.L.R.B. at 1353. A four-paragraph "Discussion" follows. The first paragraph notes that the Union was certified in 1987 and that the Company then refused to bargain with it; the second and third paragraphs list the dates and amounts of the Company's wage increases. *Id.* at 1354. The final paragraph begins with the observation that the increases occurred at "relatively regular intervals," particularly during the five-year period immediately preceding the Union election. *Id.* at 1354. The Board concludes that

the limited discretionary aspects of the [Company's] practice with respect to timing and amounts were not sufficient to preclude a finding that the across-the-board increases had become a term and condition of employment. In these circumstances, the unilateral refusal to continue the practice was unlawful under Section 8(a)(5).

*Id.*

The Board apparently thought it sufficient to summarize the dates and amounts of the wage increases, note their approximate regularity, and conclude that the increases constituted an established practice. When viewed from one perspective, there is no question that the Company's wage increases were

somewhat regular: they usually occurred at intervals of from six to seven-and-a-half months, and they generally fell between 20 and 30 cents an hour. When viewed from another perspective, however, the increases appear somewhat irregular: one year there were three raises, in another, just one; the across-the-board hourly raises ranged from a high of 30 cents to a low of 15 cents.

The difficulty we noted in *Acme* is that the Board's perspective seems to shift from case to case. Predicting whether the Board will view a pattern of wage increases as established or discretionary has proven difficult not only for employers and employees, but for the Board's own ALJs as well. In many of the Board decisions cited in *Acme*, the Board overruled the ALJ's findings that an employer's wage increases were sufficiently regular to constitute an established practice. *See Orval Kent Food Co.*, 278 N.L.R.B. 402, 403, 1986 WL 54103 (1986); *Ithaca Journal–News, Inc.*, 259 N.L.R.B. 394, 394–96, 1981 WL 21026 (1981); *Great Atlantic & Pacific Tea Co.*, 192 N.L.R.B. 645, 645–46 (1971). It was precisely to allow the Board to illuminate the "borderline" between a settled practice and a discretionary one that we remanded the issue in *Acme*.

Where, then, is the rule that we requested of remand? At oral argument, counsel for the Board was unable to identify a single sentence in the Supplemental Decision that was responsive to our instruction in *Acme*. The Board contends that it should not be faulted for failing to provide "a numerical or other bright-line test to determine when a pattern of general raises exhibits sufficient attributes of duration and regularity to be deemed a term of employment." Brief for Respondent at 18. It fails to explain, however, why this particular pattern should constitute a settled employment practice while others that are difficult to distinguish from this one do not.

We did not expect the Board to state with mathematical precision when a pattern of wage increases is sufficiently regular to constitute a settled practice; we simply asked the Board to "set the parameters." The rule we envisaged might have identified the various criteria that are to be taken into consid-

eration and the appropriate weight to be accorded each. Had the Board been unable to comply with our request and explained, on remand, that it had found it impossible to establish a workable rule, given the numerous and imponderable variables to be weighed, we might have been satisfied. The Board, however, not only failed to formulate a rule, it failed even to explain why it was unable to do so—if that indeed was the case.

Taking a different tack, the Board argues that the "result here may well be compelled by this Court's decision" in *Daily News*. Brief for Respondent at 14. We are unpersuaded by this argument. In *Daily News*, in which we found the existence of a settled pattern, the employer granted wage increases "on or about the employee's date of hire or last promotion." 73 F.3d at 408. We observed that "the sole criterion for determining the amount of the increases was merit," *id.*, and that "the employer was constrained both by the established procedures for evaluating employees and by the fixed criteria for making each individual merit decision," *id.* at 412. Here, the timing of the increases, while somewhat regular, was by no means fixed; and, what is more important, there is no evidence that the Company had "constrained" itself by "established procedures" or "fixed criteria" for establishing the amounts of the increases.

## B. Remedy

■ In its Initial Decision, the Board affirmed the findings and conclusions of the ALJ that are relevant here, 309 N.L.R.B. at 1085, but modified his proposed remedial order as it related to Acme's failure to grant pay increases in 1988. The ALJ had found that, but for the Company's unfair labor practices, it would have raised wages 25 cents an hour in February and July 1988, *id.* at 1160; he therefore recommended a corresponding award of backpay to the affected employees, *id.* at 1161–62. The Board agreed that two raises would have been given in 1988 but found that "the evidence presented at trial was insufficient to determine the appropriate amounts of these wage increases." *Id.* at 1086. Therefore, it postponed the determination of the appropriate amount

of the backpay award to the compliance stage of the proceeding. *Id.*

At oral argument, counsel for the Company informed the court that, in 1989, Acme resumed a pattern of across-the-board increases in the course of its continuing negotiations with the Union. This being so, the only year for which a remedy is at issue is 1988. As Board Member Cohen notes in the Supplemental Decision, because the discontinuance of wage increases in 1988 violated section 8(a)(3), "[a] finding that such conduct also violated Sec. 8(a)(5) [does not] add materially to the remedy." 317 N.L.R.B. at 1354 n. 11. Indeed, irrespective of whether the Company has violated section 8(a)(5), the employees are entitled to be made whole for the monetary losses they suffered as a result of the Company's discontinuance of wage increases in 1988.

Because the practical consequences of finding a section 8(a)(5) violation appear to be insignificant here, we decline to remand yet again in order to determine whether, in light of a yet-to-be-crafted Board rule, the Company's pattern of wage increases was sufficiently regular to constitute an established practice. We do, however, register our hope that the next time the Board finds a pattern of increases to be a settled practice, it will take the opportunity to clarify this murky area of the law or explain why this cannot be done.

## III. Conclusion

Because the Board has failed to identify a rule as to when the frequency and quantity of wage increases constitute a settled practice, we deny its petition for enforcement insofar as its order is designed to remedy the section 8(a)(5) violation. Enforcement is granted, however, in all other respects.

*So ordered.*

WALD, Circuit Judge, dissenting:

I agree with the majority that the National Labor Relations Board ("NLRB" or "Board") might have reasoned more explicitly on remand in determining that Acme Die Casting ("Company") had violated section 8(a)(5) of the National Labor Relations Act by unilaterally withholding pay increases in 1988. I believe, however, that the Board's supplemental decision and order does manage to set out a "comprehensible standard for deciding whether a pattern of increases is sufficiently consistent in timing and/or amount to constitute a settled practice," thus honoring the instruction of the prior panel. *Acme Die Casting v. NLRB*, 26 F.3d 162, 166 (D.C.Cir. 1994) (*Acme I*).

As the majority opinion relates, the Board's supplemental decision began with a description of the procedural history of the dispute and related enforcement actions against the Company. The Board then listed the dates of the sixteen pay increases that the Company offered between 1980 and 1987, as well as the amounts of the increases. It indicated that all of the increases save one were across-the-board raises in which every employee received the same hourly wage increase, and explained the one exception as an instance when the Company was attempting to equalize wages. The Board also noted that increases ranged from 15 to 30 cents per hour, with most falling between 20 to 25 cents per hour.[1]

The Board next turned to a discussion of the timing of the increases. It concluded that they occurred at "relatively regular intervals," and while not interspersed at precisely the same intervals, they were by no means random either. In support of this conclusion the Board noted that thirteen of the fifteen intervals between pay increases fell within the range of five to seven-and-a-half months. The Board also emphasized that the Company had given raises over a seven-and-a-half year period and that for the five most recent years, September 1982 to September 1987, the intervals were even more similar, ranging only from six to seven-and-a-half months.

As this overview reveals, the supplemental decision pretty clearly indicates the factors that the Board considers important in determining whether a pay increase has become a settled practice. The Board focused on the

---

1. The majority's opinion indicates that all but three of the sixteen increases were between 20 to 25 cents per hour. *See* Majority opinion ("Maj. op.") at 856.

following: whether the increases were given across-the-board or only to selected employees; whether the amounts of the increases and the intervals between increases were reasonably similar; whether the increases had been given over a lengthy period; and whether the increases had become more regular over time. While the Board did not state precisely what weight is to be given to each of these factors, its discussion puts greatest emphasis on the fact that the Company's pay increases occurred at "regular intervals" and over a "significant period of time." This emphasis on timing is consistent with the Board's statement that its decision in this case is supported by its more elaborate analysis of the law, on remand, in *Daily News of Los Angeles,* 315 N.L.R.B. 1236, 1994 WL 731261 (Dec. 30, 1994). In *Daily News,* the Board reviewed its precedents and clarified its governing principle that increases given "in a clearly established pattern" are to be distinguished from those given at "random irregular intervals"; the former but not the latter become a settled term and condition of employment. *Id.,* at 1240–41.[2]

It is of course quite apparent from its supplemental decision that the Board has eschewed the use of any bright-line rules, such as an inflexible requirement that intervals between increases must not vary in length more than two months, to define what is or is not a settled practice of pay increases. The Board is justified in this stance, given its traditional pattern of case-by-case adjudication rather than rulemaking, so long as its parameters or its criteria are reasonable and discernible—as they are here.

Moreover, as the majority acknowledges, our remanding order in *Acme I* did not require that the Board adopt a bright-line rule but rather only that the Board "set the parameters" to be used in determining that pay increases "constitute a settled practice." *Acme I,* 26 F.3d at 166. The Board's clearly-evident concern is simply that increases be characterized by "relative consistency" as to timing and amount.

No doubt the Board could have spoken with greater clarity, indicating in one formula which factors are relevant to determining whether a pay increase has become a settled practice and which are not, the weight assigned to each and explaining why it rejected a more bright-line approach. But the majority unfairly ignores the analysis that the Board *does* offer; for example, the majority skips over much of the Board's discussion of the timing of the increases and refuses to draw obvious inferences from the supplemental opinion simply because these inferences are not explicitly stated up front. In addition, the majority errs when it claims that "there is no evidence that the Company had 'constrained' itself by 'established procedures' or 'fixed criteria' for establishing the amounts of the increases." Maj. op. at 858. *Daily News II* specifically held that a settled practice could exist where an employer retained discretion over the pool of money available for increases provided there be "fixed criteria" to determine who qualifies for a pay increase and the amount each individual employee receives. 73 F.3d at 408, 411–12. Here, the Board's supplemental opinion makes clear that the increases were given across-the-board in the same amount, and thus there is evidence of fixed criteria used to determine who qualified for an increase and how much each employee received.[3]

2. On review of the Board's supplemental decision in *Daily News* we stated that "fixed timing alone" would not be sufficient to create a settled practice of merit pay increases but held that a settled practice could exist if a "merit-increase program is fixed as to timing and criteria." *Daily News of Los Angeles v. NLRB,* 73 F.3d 406, 412 & n. 3 (D.C.Cir.1996) (*Daily News II*).

3. In addition, since our decision in *Daily News II* was issued after the supplemental opinion here, the Board has not yet had occasion to decide how the fixed criteria requirement should be

applied, if at all, where the increases are not based on merit or where the increases are similar in amount. It is not immediately apparent that *Daily News II,* which addressed merit-pay increases, should also apply in other contexts. *See, e.g., Acme I,* 26 F.3d at 166 ("We are aware that Daily News may be distinguishable [because it] involved merit-based increases ... rather than the across-the-board increases at issue here."). We should leave this question for the Board to address in the first instance.

As I read the supplemental opinion, the Board has identified which factors are relevant to deciding when pay increases have become a settled practice, indicated the relative importance of these factors and told us that it will apply a "relative consistency" standard to determining when pay increases constitute a settled practice; in my view that is enough to comply with our prior order on remand. *Chevron* deference precludes us from requiring that it do the job as professorially as we might prefer. *See N.L.R.B. v. Curtin Matheson Scientific, Inc.,* 494 U.S. 775, 786–87, 110 S.Ct. 1542, 1549, 108 L.Ed.2d 801 (1990) (noting that NLRB deserves deference as it bears "primary responsibility for developing and applying national labor policy"); *Gilbert v. NLRB,* 56 F.3d 1438, 1444 (D.C.Cir.1995) (courts must accept reasonable NLRB constructions of the NLRA under *Chevron*).