**BRYANT & STRATTON BUSINESS INSTITUTE, INC., Petitioner– Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross– Petitioner,**

**International Union, United Automobile, Aerospace and Agricultural Implement Workers Of America, UAW,Intervenor.**

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Bryant & Stratton Business Institute, Inc., Intervenor.**

**BRYANT & STRATTON BUSINESS INSTITUTE, INC., Petitioner– Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross– Petitioner.**

**International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Intervenor.**

**Nos. 96–4131, 96–4159, 96–4160, 97–4079 and 97–4139.**

United States Court of Appeals, Second Circuit.

Argued June 11, 1997.

Decided March 24, 1998.

James A. Rydzel, Cleveland, OH (Robert S. Gilmore, Rosalie B. Harrison, Jones, Day, Reavis & Pogue, Cleveland, OH, on the briefs), for Bryant & Stratton Business Institute, Inc., Petitioner–Cross–Respondent in Nos. 96–4131, 96–4159, 97–4079 & 97–4139 and Intervenor in No. 96–4160.

Eugene W. Salisbury, Buffalo, NY (Jennifer R. Willig, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria LLP, Buffalo, NY, on the briefs), for International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, UAW, Intervenor in Nos. 96–4131, 96–4159, 97–4079 & 97–4139 and Petitioner in No. 96–4160.

Sharon I. Block, Attorney, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Linda Dreeben, Supervisory Attorney, Lisa R. Shearin, Attorney, National Labor Relations Board, Washington, DC, on the briefs), for National Labor Relations Board, Respondent–Cross–Petitioner in Nos. 96–4131, 96–4159, 97–4079 & 97–4139 and Respondent in No. 96–4160.

Before: WALKER, McLAUGHLIN and PARKER, Circuit Judges.

PARKER, Circuit Judge:

The National Labor Relations Board ("NLRB" or the "Board") seeks, on cross-petition, to enforce its orders entered August 23, 1996 (Chairman Gould, Members Browning and Cohen, *Panel*) and April 8, 1997 (Chairman Gould, Members Fox and Higgins, *Panel*) finding violations of the National Labor Relations Act ("NLRA" or the "Act"), 29 U.S.C. § 151 et seq. (West 1973 & Supp.1997). Because the orders pertain to related issues and remedies, we have consolidated the appeals concerning these orders.

The orders require petitioner Bryant & Stratton Business Institute, Inc. ("Bryant") to, *inter alia*, cease and desist from refusing to bargain with International Union, United Automobile Aerospace and Agricultural Implement Workers of America, UAW ("UAW" or the "Union"), make restitution to unit employees for back wage-increases, and extend the Union's certification for one year.

Bryant and UAW have each filed petitions seeking review of the orders. UAW and Bryant both intervened in the appeal brought by the other party.

## I. BACKGROUND

Bryant owns and operates several business and technical schools offering various degree programs. Three of these schools are relevant to this appeal: the Downtown Buffalo campus, the Eastern Hills campus, and the Southtowns campus (collectively, the "Buffalo Campuses"). On November 21, 1989, the Board certified UAW as the exclusive representative of all full-time faculty on the Buffalo Campuses. Negotiations between Bryant and UAW for an initial collective bargaining agreement ("CBA") began in January 1990. The orders at issue here arose from a number of unfair labor practices charges filed by the Union against Bryant beginning in April 1990 as a result of the parties' efforts to negotiate an initial CBA.

### A. *The Proceedings Below*

#### 1. *Bryant & Stratton I*

UAW principally alleged in these charges that Bryant made various unilateral changes in the terms and conditions of employment of the unit employees and failed to bargain with the Union in good faith in violation of the NLRA. The first complaint and Notice of Hearing was issued against Bryant on June 21, 1990. A hearing was held before Administrative Law Judge ("ALJ") Jesse Kleiman from November 13 through December 13, 1990. The original complaint was amended during the hearing, and when yet another charge was raised on December 13, 1990, the

hearing was adjourned to permit further investigation.

During the adjournment, the Union filed several additional charges against Bryant, which resulted in the issuance of additional complaints and Notices of Hearing between March and August 1991.

By order dated October 3, 1991, the ALJ granted the General Counsel's motion dated August 28, 1991 to amend the original complaint yet again. The order also consolidated all cases concerning the parties and directed that the hearing in the consolidated case be resumed on December 3, 1991. The hearing commenced on December 3, 1991 and continued on various dates through March 30, 1992.

More than two years later, in a decision dated June 23, 1994, the ALJ determined that Bryant had committed several of the charged unfair labor practices. Specifically, with respect to the issues relevant to this appeal, the ALJ found that Bryant:

a. violated Sections 8(a)(1) and (5) of the NLRA by unilaterally implementing a mandatory requirement that employees at its Southtowns campus use sign-in boards;

b. violated Sections 8(a)(1) and (5) of the NLRA by unilaterally discontinuing its practice of providing unit employees with prior written notice of classroom observations by management;

c. violated Sections 8(a)(1) and (5) of the NLRA by unilaterally requiring faculty to accept end-of-quarter assignments after final exams had been administered;

d. violated Sections 8(a)(1), (3) and (5) of the NLRA when it unilaterally suspended discretionary merit wage increases; and

e. engaged in illegal surface bargaining in violation of Sections 8(a)(1) and (5), and 8(d) of the NLRA by failing to bargain in good faith from January 22, 1990 to March 12, 1991.

Section 8(a)(5) of the Act provides that "[i]t shall be an unfair labor practice for an employer ... to refuse to bargain collectively with the representatives of his employees, subject to [collective bargaining under 29 U.S.C. § 159(a) ]." 29 U.S.C. § 158(a)(5). Section 8(d) specifies the subject matter of such collective bargaining as including "wages, hours, and other terms and conditions of employment," and further requires that the parties "meet at reasonable times and confer in good faith." 29 U.S.C. § 158(d). Accordingly, read together, Sections 8(a)(5) and 8(d) require parties in a collective bargaining relationship to negotiate in good faith with regard to terms and conditions of employment.

Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees" in the exercise of their rights under section 7, which includes the right "to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. §§ 157, 158(a)(1).

Section 8(a)(3) makes it an unfair labor practice for an employer to " 'discourage membership in any labor organization' by discriminating in regard to hire or tenure of employment or any term or condition of employment." 29 U.S.C. § 158(a)(3).

Thus, a violation of Section 8(a)(1) or (3) occurs when an employer's actions interfere with or seek to discourage the exercise of the rights of its employees to organize or become members of a labor organization.

Upon finding violations of these statutes, the ALJ ordered Bryant to, *inter alia*, make restitution to unit employees for back wage-increases and to bargain with UAW as if its initial certification had been extended for one year. Bryant timely filed Exceptions to the ALJ's opinion, seeking review by the NLRB.

On August 23, 1996, the NLRB issued a final Decision and Order adopting the ALJ's opinion with some modifications. *Bryant & Stratton Bus. Inst.*, 321 N.L.R.B. 1007, 1996 WL 482931 (N.L.R.B. Aug. 23, 1996) (hereinafter *"Bryant & Stratton I"*). The Board determined that the ALJ erroneously determined that Bryant violated the NLRA by (1) reminding faculty to use the in/out boards; (2) discontinuing the pilot program to provide

prior written notice of classroom observations; and (3) giving faculty end-of-quarter assignments during the twelfth week of the quarter. The Board based these determinations on its findings that none of these actions constituted a change in the terms or conditions of employment for the unit employees, and that these actions had not been taken in bad faith. However, the Board adopted the ALJ's findings and remedies with respect to the other violations and the extension of the certification.

### 2. Bryant & Stratton II

On April 19, 1996, Bryant withdrew recognition from UAW basing such withdrawal on lack of majority support for UAW, shown by signed declarations from twenty-two of the thirty-five bargaining unit members stating that they no longer wished to be represented by UAW. Thereafter, Bryant refused to comply with the Union's requests for information concerning terms and conditions of the employment of the unit employees.

The Union filed various unfair labor practice charges during the period from November 22, 1995 through July 29, 1996. On October 23, 1996, the General Counsel issued a consolidated complaint against Bryant alleging, *inter alia*, that Bryant improperly withdrew recognition from the Union and failed and refused to provide the Union with information it requested concerning the bargaining unit members. The General Counsel filed a motion for partial summary judgment on the ground that Bryant's actions violated Sections 8(a)(1) and (5) of the NLRA, as a matter of law, because the NLRB's determination in *Bryant & Stratton I* established that the requisite one-year period of good-faith bargaining following the Union's certification had not elapsed.

The Board granted partial summary judgment against Bryant on the basis that UAW enjoyed an irrebuttable presumption of majority status at all times relevant to the dispute based on *Bryant & Stratton I*, which provided for a one-year extension through August 28, 1997 of UAW's certification to allow the Union a reasonable period of time to pursue good-faith bargaining free from the influences of Bryant's previous unfair labor

practices. *Bryant & Stratton Bus. Inst.*, 323 N.L.R.B. No. 67, 1997 WL 174369 (N.L.R.B. Apr. 8, 1997) (hereinafter *"Bryant & Stratton II"*).

We affirm the findings of the Board in all respects and hereby grant enforcement.

## II. DISCUSSION

UAW appeals only the Board's modifications of the opinion of the ALJ in *Bryant & Stratton I* on the ground that the Board's findings in support of the modifications are not supported by substantial evidence on the record, and are contrary to the language and tenor of the Act.

Bryant appeals the Board's affirmance of the ALJ's findings in *Bryant & Stratton I* that Bryant's wage freeze violated the NLRA, and that Bryant had failed to bargain in good faith. Bryant also contests the appropriateness of the prescribed remedies in *Bryant & Stratton I,* as well as the Board's determination that Bryant wrongfully withdrew recognition from the Union in *Bryant & Stratton II.*

■ "[T]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall ... be conclusive" upon review by this Court. 29 U.S.C. § 160(f); *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). "We have previously interpreted this to mean that 'reversal based upon a factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board.'" *N.L.R.B. v. Katz's Delicatessen*, 80 F.3d 755, 763 (2d Cir.1996) (quoting *N.L.R.B. v. Albany Steel, Inc.*, 17 F.3d 564, 568 (2d Cir.1994) (internal quotations and alterations in original)).

We consider each issue raised by UAW and Bryant in turn under these standards.

### A. *Bryant's Required Use of the Sign–In Boards*

On February 26, 1990, Bryant issued a memorandum to the faculty at the Southtowns campus that stated in pertinent part: "Effective Monday, March 5, all full-time faculty and staff are required to utilize the In/Out Boards located near the administrative offices." The stated purpose of the sign-in boards was to enable students attempting to meet with faculty members to easily determine whether a given faculty member was on campus.

Bryant maintains that it had always been its policy to require that the boards be used, although it admitted that the policy had not always been vigilantly enforced.

A witness for the General Counsel largely confirmed this contention, testifying, without contradiction, that the sign-in boards had been in existence since he joined the company in 1986, but that "at varying times [the board] . . . was utilized for a few months and then all of a sudden it was forgotten and brought back up again and then forgotten again and brought back up again. . . ." He further testified that Bryant had most recently "instructed" employees to use the sign-in boards in the summer of 1988.

The Union contends, despite the above testimony, that Bryant's instruction in the February 26 memorandum constituted a unilateral change in terms and conditions of employment of unit employees in violation of NLRA Sections 8(a)(1) and (5) because prior to issuance of the memorandum, use of the sign-in boards had been purely voluntary. The Union based this contention on the lack of enforcement and the absence of a written policy.

According to the Union, the term "required" in the memorandum indicated something that was other than voluntary, and that the implicit threat of discipline in cases of future noncompliance signified a unilateral change to a condition of employment. Therefore, the Union contends, the policy set forth in the memorandum constituted a unilateral change in the terms and conditions of employment of unit employees.

The ALJ determined that Bryant's imposition of this more stringent requirement of compliance with respect to use of the sign-in boards, without notifying or bargaining with the Union about the change, was in violation of Sections 8(a)(1) and (5) of the Act. The ALJ stated that "the change from an occasional and lax request to use the board to a mandatory requirement of use, carries with it the reasonable inference that noncompliance with this directive now, might well result in some sort of discipline being imposed."

The Board, however, found that the General Counsel failed to establish that the sign-in board policy was voluntary prior to 1990, that there was no evidence that the February 26 memorandum contained an implicit threat of future discipline, and that "[Bryant's] actions on February 26, 1990, were no different than its previous encouragement of employees to comply with its established policy in this regard." *Bryant & Stratton I*, 1996 WL 482931, at *1. Thus, the Board reversed the ALJ and found that Bryant had not violated the NLRA by unilaterally requiring employees at the Southtowns campus to utilize the sign-in boards.

 Although the Board did not disagree with the factual findings made by the ALJ concerning the enforcement of the policy prior to the February 26, 1990 memorandum, the Board reached a different legal conclusion based on its view of the record. This Court's standard of review does not change where the Board disagrees with the ALJ. *Local One, Amalgamated Lithographers v. N.L.R.B.*, 729 F.2d 172, 176 (2d Cir.1984). It is well-settled that when, as here, the Board and the ALJ draw different legal conclusions from the same record evidence, the ALJ's conclusions are entitled to no special weight. *Local 259, U.A.W. v. N.L.R.B.*, 776 F.2d 23, 27 (2d Cir.1985). In such circumstances, this Court is not permitted to draw its own inferences. Rather, we must, where possible, acknowledge that on the record considered as a whole there is substantial evidence to support the Board's finding. *See, e.g., Textile Workers Union v. N.L.R.B.*, 388 F.2d 896, 902 (2d Cir.1967).

■ We hold that the record sustains the Board's findings that Bryant's required use of the sign-in board was a reaffirmation of its previous policy and not a change in the employee's terms and conditions of employment of unit employees.

The Board's findings were based on the testimony by the General Counsel's witness that: (1) Bryant had maintained a sign-in board at its Southtowns campus since at least 1988, two years prior to the advent of the Union; (2) employees would sometimes fail to use the board, and Bryant would periodically renew its instruction to employees to use the board on a consistent basis; (3) "no big deal was made" of the sign-in board after February 26 and the issue of what would happen in cases of noncompliance was "never discussed." Furthermore, no evidence was presented that Bryant had ever imposed any discipline for noncompliance with the requirement. Accordingly, there is substantial evidence showing that the memorandum issued February 26, 1990 was nothing more than the latest reminder in a pattern of disuse-reminder-disuse-reminder, etc.

In addition, the ALJ indicated that Bryant's decision to "reimplement [the] requirement to make use of the in/out board after a hiatus of 2 years of nonuse and after the Union's certification and the commencement of bargaining between the parties" seemed motivated by an improper purpose in violation of NLRA Section 8(a)(1). Here again, however, there was substantial evidence on the record to permit the Board to infer that Bryant's February 1990 directive, issued several months after the Union's certification, was in line with its previous efforts to secure employee compliance with an established policy. Moreover, we find that there was at most a "hiatus" with respect to enforcement of the policy, not with respect to its existence, which had been continuous since at least 1988. Accordingly, we also agree with the Board's determination that Bryant did not violate NLRA Section 8(a)(1) by reasserting the policy for an improper motive.

B. *Elimination of the Preobservation Notification*

■ As part of its 1989 Faculty Evaluation System, Bryant implemented a preobserva-tion notice program in September 1989. The introduction of this "pilot program" predated the Union's certification by approximately one month. Bryant's management has always observed faculty in a classroom setting, conducting classes. The parties agree that these classroom observations are an important factor in the faculty evaluation process. Prior to introduction of the pilot program, faculty observations had generally been performed without prior notice. Although two faculty witnesses testified that they had received oral, and even written, notifications prior to the September 1989 pilot program being instituted, there is no other evidence in the record to support those assertions.

Bryant introduced the preobservation notice program as an experiment for the September 1989 quarter. One witness for Bryant testified that pilot programs "generally last for one quarter." However, another of its witnesses characterized the program as a "major change" and testified that Bryant anticipated that if the program ran successfully, it would continue. In any event, after evaluating the program and determining that it was unsuccessful, Bryant notified the faculty that it would discontinue the preobservation notice program at the end of the September 1989 quarter.

The Union contends that the preobservation notification program had become a term and condition of employment upon which the employees had reasonably come to rely. This contention is based on the following: (1) the faculty was never informed that the program could or would be terminated at the end of the September 1989 quarter; and (2) Bryant's past practice with respect to pilot programs was to continue the program unless or until problems developed. UAW therefore claims Bryant's unilateral change concerning preobservation notification constitutes a violation of Sections 8(a)(1) and (5).

A majority of the Board found that "advance notification of observations was not an established term and condition of employment at the time it was discontinued in January 1990." *Bryant & Stratton I*, 1996 WL 482931, at *2. We agree.

The Board relied on testimony of one of Bryant's witnesses that pilot programs generally last for one quarter after which management evaluates them. One witness further stated that consistent with this past practice, Bryant continued the advance notification pilot program for one quarter, and then evaluated the program, which resulted in discontinuance.

The testimony of another Bryant witness also established that pilot programs generally last for one quarter and are then evaluated by management. As the witness stated, "it was anticipated by [Bryant] that if the program ran successfully without problems it would continue on."

The purpose of a pilot program is to determine whether a program will be successful for some longer term. Bryant's decision to undertake the pilot program did not amount to a guarantee that the program would continue. The employees had no right to expect any particular result as the decision whether to continue the program was exclusively Bryant's. Even if the employees believed that the pilot program was successful, Bryant was free to decide to discontinue the program if it did not agree.

Because it was generally understood that pilot programs last for one quarter and are then evaluated by management, Bryant was not required, as UAW contends, to advise the faculty that the program might be terminated after the September 1989 quarter. As the NLRB notes in its brief, the Union's statement that "the employees reasonably expected that [the preobservation notice procedure] *could* continue indefinitely absent any problems" implicitly acknowledges the employees' equal awareness that Bryant could cancel the program based on its evaluation.

We find that the Board's holding that Bryant did not change its past practice regarding pilot programs and did not violate the Act by discontinuing the preobservation notification program is supported by substantial evidence.

The dissenting panel member took the same position as the ALJ: regardless of Bryant's past practice with regard to pilot programs, the decision regarding the contin-

uation of this pilot program was a discretionary decision that directly affected terms and conditions of employment as these evaluations impacted on employee salary reviews. Therefore, discontinuation of the pilot program without notice to the Union and an opportunity to bargain violated Section 8(a)(5) of the Act. This argument is incorrect because it fails to address the fundamental question of whether the preobservation notification program itself constituted a term or condition of employment.

Finally, UAW's argument that the fact Bryant discontinued the preobservation notification program shortly after the Union was certified makes Bryant's actions "suspicious" is without merit. There is no evidence in the record to suggest that the implementation or the discontinuation of the preobservation notification program had anything to do with the Union's status. Although UAW was certified in November 1989 and the pilot program was discontinued at the end of the Fall 1989 semester, Bryant instituted the pilot program in September 1989 even though it was aware that the Union's certification was imminent. Had Bryant wanted to play hardball with the Union, it could have decided not to initiate the program at all. These circumstances imply that Bryant's introduction of the pilot program was in good faith to determine whether it would be successful. Accordingly, we also hold that there is substantial evidence to support the Board's finding that Bryant's discontinuance of the program was not in violation of Section 8(a)(1).

C. *Institution of the End-of-Quarter Assignments*

■ In June 1988, prior to the start of any Union activity, Bryant issued to the faculty its Instructor Compensation Plan (the "Plan"). In relevant part, the Plan required mandatory faculty participation in "Scholarship Days" and registration activities without granting additional compensation. Prior to the issuance of the Plan, faculty members who performed such assignments received extra compensation. As of November 1988, however, the extra compensation was withdrawn. Bryant based this decision on the fact that faculty members are paid on the

basis of a twelve-week semester, and the twelfth week of each semester consisted of Scholarship Days and registration activities in addition to final examinations.

In a memorandum dated December 13, 1989, Bryant informed faculty members at one Downtown Buffalo campus that they would be required to sign up for a three-hour assignment on either December 14th or 15th to assist in the registration of students for the next semester, and on December 16th to speak with prospective students who would be taking a scholarship exam and to proctor that exam. The evidence indicates that final exams were usually administered on the first two days of the twelfth school week of each quarter, and that prior to the implementation of the Plan, faculty members who had no other duties to perform were ordinarily permitted to leave the school after final exams, although they were paid for the full twelve weeks.

UAW contends, and the ALJ found, that Bryant violated Sections 8(a)(1) and (5) of the Act by unilaterally requiring the faculty to accept end-of-quarter assignments after final exams had been administered as this constituted a new term or condition of employment. Although the ALJ found that the assignments themselves were in accordance with the terms of the Plan, he determined that Bryant's action nonetheless violated the Act because "the evidence [establishes] a past practice of allowing faculty to finish their academic job duties after the first two days in the twelfth and final week of a quarter, whereafter they were free to leave the school from that period on ... notwithstanding that they were paid for a full 12–week period." The ALJ concluded that mandatory assignment constituted a unilateral change in violation of the Act. Thus, the duties did not "fall within the range of job duties instructors were hired to perform."

Again a majority of the Board rejected the ALJ's findings. The majority found, on an undisputed record, that: (1) Bryant implemented the Plan before the Union was certified; (2) the Plan required faculty to participate in "Scholarship Days" and registration assistance activities; and (3) Bryant's action in December 1989 to schedule sign-up for these end-of-quarter activities was consistent with the Plan. Based on these findings, the Board concluded that, "[w]hether or not employees had been free to leave campus after giving their class final exams in the past ... [Bryant's] past practice in this regard was materially altered by the Instructor Compensation Plan requiring faculty to participate in registration assistance and scholarship activities as and when assigned, without additional compensation." *Bryant & Stratton I,* 1996 WL 482931, at *3. Therefore, Bryant "did not unilaterally modify any past practice when it scheduled the registration and scholarship duties for the period following final examinations in December 1989." *Id.* We agree.

Although the past practice allowed the faculty to commence their vacations after the administration of final exams and before the end of the twelfth-week of the semester, the record is clear that the Plan changed this practice prior to the certification of the Union.

UAW argues that because the employees had come to rely on this time off and that the Plan did not specifically state that they would no longer be allowed to leave following the administration of final exams, their perceptions did not change with the issuance of the Plan even though the Plan made the employees' participation in end-of-quarter assignments mandatory. This argument fails. The faculty members would not be able to both leave early *and* participate in end-of-quarter assignments. Bryant's requirement that faculty participate in end-of-quarter assignments obviously required faculty members to be present during the period when those activities occurred, i.e., the full twelfth school week of the quarter.

### D. *Bryant's Unilateral Suspension of Wage Increases*

■ In November 1989, Bryant notified the deans of its Buffalo Campuses that it would put a hold on wage increases pending the outcome of wage-related negotiations with the Union. UAW contends that Bryant's unilateral suspension of the wage increases was in violation of Sections 8(a)(1), (3) and (5) of the NLRA.

Bryant claims that, since at least 1987, its practice has been to provide totally discretionary pay increases, which have not been "automatic" in terms of timing or amount, and which are not based on fixed criteria such as merit. Therefore, Bryant contends that as a matter of law it was required to freeze its discretionary wage increase practice until wage-related issues were negotiated.

Bryant bases this contention on *N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962). In *Katz*, the Supreme Court held that an employer negotiating with a newly certified bargaining agent was barred from unilaterally granting wage or merit increases unless they are fixed and automatic in nature. *Id.* at 746, 82 S.Ct. at 1113. The Court explained its reasoning for prohibiting discretionary increases as follows:

> There simply is no way in such case for a union to know whether or not there has been a substantial departure from past practice, and therefore the union may properly insist that the company negotiate as to the procedures and criteria for determining such increases.

*Id.* at 746–47, 82 S.Ct. at 1113. Because there is the potential that an employer might abuse the wage-increase process in the absence of established procedures and criteria, the employer's unilateral action in granting discretionary merit increases would be "tantamount to an outright refusal to negotiate on that subject, and therefore [ ] a violation of [Section] 8(a)(5)." *Id.* at 746, 82 S.Ct. at 1113.

In *Katz*, the parties had been negotiating over merit increases without reaching a final understanding when the company, without notice to the union, granted merit increases ranging between $2 and $10 to approximately forty percent of its employees. The Supreme Court determined that these increases were not in line with the company's long-standing practice of granting quarterly or semiannual merit reviews, and therefore were not a "mere continuation of the status quo." *Id.* Thus, the company was trying to impose increases on its employees without bargaining over the procedures and criteria that such increases should be based on.

Bryant contends that *Katz* requires the Board to first determine whether Bryant's wage practice was "fixed and automatic" (and therefore must be continued) or "discretionary" (and therefore cannot be continued). Bryant also argues that the Board has repeatedly failed to articulate an identifiable standard for determining what constitutes "fixed and automatic" as opposed to "discretionary" for the purposes of *Katz*. (Citing *Acme Die Casting v. N.L.R.B.*, 93 F.3d 854 (D.C.Cir.1996) ("*Acme II* ")).

In *Acme Die Casting v. N.L.R.B.*, 26 F.3d 162 (D.C.Cir.1994) ("*Acme I* "), the court remanded the question of whether an employer committed unfair labor practices with respect to wage increases for formulation of a clearer standard for determining when granting or withholding wage increases constitutes a refusal to bargain. *Id.* at 168. In that case, the company granted its employees across-the-board wage increases ranging from 15 cents to 30 cents an hour semi-annually from January 1980 through February 1987. In September 1987, the company granted raises ranging between 10 cents and 40 cents an hour, which were intended to equalize salaries among the employees. A union was elected in October 1987. The company did not give any wage increases in 1988. In January 1989, the company awarded an across-the-board increase of 30 cents. The Board found that the failure to grant wage increases in 1988 represented a departure from a settled practice without bargaining in violation of Section 8(a)(5) of the Act. *Acme II*, 93 F.3d at 856. The D.C. Circuit remanded this finding to the Board with instructions to "set comprehensible rules as to when the frequency and quantity of wage increases constitute a settled practice that the employer must continue." *Acme I*, 26 F.3d at 168. On remand, however, the Board merely reiterated its earlier conclusion that the company's failure to grant its employees wage increases in 1988 constituted a unilateral change in the terms and conditions of employment in violation of Section 8(a)(5) of the Act. *Acme II*, 93 F.3d at 855. The appellate court conveyed its exasperation with the Board for failing to identify a rule as to when the frequency and quantity of wage increases

constitutes a settled practice when it stated: "[W]e will not remand a second time. Rather, we throw up our judicial hands and will enforce the Board's remedial order only with respect to those findings of unfair labor practices that we have already affirmed." *Id.* at 855–56. In another part of the opinion, the court elaborated:

> [T]he Board's perspective seems to shift from case to case. Predicting whether the Board will view a pattern of wage increases as established or discretionary has proven difficult not only for employers and employees, but for the Board's own ALJ's as well. In many of the Board decisions cited in [*Acme I* ], the Board overruled the ALJ's findings that an employer's wage increases were sufficiently regular to constitute an established practice. It was precisely to allow the Board to illuminate the "borderline" between a settled practice and a discretionary one that we remanded the issue in [*Acme I* ]. Where, then, is the rule that we requested of remand?

*Id.* at 858 (internal citations omitted).

Bryant argues that this case is similar to *Katz* and *Acme I/II*. Bryant contends that its wage increase policy is discretionary as to time and criteria, as was the case in *Katz*. Additionally, as in *Acme I/II*, Bryant claims that here "the timing of the increases, while somewhat regular, was by no means fixed," and the company had not 'constrained' itself by 'established procedures' or 'fixed criteria' " such as merit "for establishing the amounts of the increases." *Acme II*, 93 F.3d at 858. Rather, Bryant states that it retained discretion to grant wage increases on the basis of unpredictable factors such as company profitability. *Acme II* refused to find a violation of the Act because the wage increases at issue were discretionary and therefore barred by *Katz*. Thus, Bryant argues, the freeze of its own discretionary wage increase policy should not be found to be violative of the Act.

In determining that Bryant's wage freeze violated the Act, the Board relied on *Daily News of Los Angeles v. N.L.R.B.*, 73 F.3d 406 (D.C.Cir.1996) ("*Daily News II* "), which had recently been enforced by the D.C. Circuit. In *Daily News II*, a company adopted its predecessor's policy of annually evaluating the performance of the relevant employees on or about the anniversary of the employee's date of hire or last promotion. This was done upon purchasing the operation in January 1986. These performance reviews were used as the basis for increasing salaries. The amount of the increase was discretionary, but the timing and criteria of the reviews were fixed. In May 1989, the union was certified. The company advised the union that it did not intend to continue with the merit program pending negotiation of economic issues. The union took the position that the increases were an existing condition of employment that the company could not unilaterally discontinue. The Board found that the merit-increase program, although discretionary as to the precise amount of each individual increase, was a fixed term or condition of employment that, pursuant to *Katz*, could not be changed without bargaining. Accordingly, the Board determined that the company had violated Section 8(a)(5) of the NLRA by unilaterally withholding the annual merit increases from employees. *Id.* at 408–09.

In *The Daily News*, 304 N.L.R.B. 511, 1991 WL 171476 (N.L.R.B. Aug. 27, 1991) ("*Daily News I* "), the Board stated:

> [O]nce the [ALJ] found that the [employer] had "a pattern and practice of evaluating the unit employees at the time of each employee's anniversary date", he correctly concluded that the [employer] was required to maintain that practice, absent an agreement with the Union to the contrary. Given the Union's specific request that the [employer] continue its merit wage program during negotiations, it clearly did not agree to any discontinuance of that program.

*Id.* at *1.

Under this standard, the ALJ in the present case determined that:

> [Bryant] had a pattern and practice of annually evaluating the unit employees and as a result of such evaluations [Bryant] would grant a discretionary wage increase mostly in July of that year at its Downtown Buffalo campus and on faculty members anniversary dates at its Eastern Hills

and Southtowns campuses, in an amount commensurate with the faculty members evaluation; and that the faculty were fully aware of [Bryant's] practice in this regard and had come to expect such a salary adjustment at the appropriate time.

Thus, on an undisputed record, the ALJ and the Board both determined that from 1979 to 1989, faculty at the Eastern Hills and Southtowns campuses received annual wage increases on their anniversary dates, while faculty at the Buffalo campus received wage increases every July. Both the ALJ and the Board recognized that if economic conditions at a school were adverse, Bryant could decide to forego the granting of any wage increase. However, they determined that from 1979 until 1990, this only happened once, when wage increases were suspended at the Downtown Buffalo campus in July 1988, though increases were subsequently awarded in January 1989. Faculty at the Eastern Hills and Southtowns campuses experienced no interruption in receiving wage increases. The fact that increases could be withheld if required did not in itself make the wage increase practice discretionary as to criteria. The ALJ and the Board therefore found that the connection between evaluations and raises was clear. We agree.

Bryant vaguely disputes the finding concerning the regularity of the raises issued between 1979 and 1990 without offering any evidence to the contrary, stating only that the Board did not cite to the record in making these determinations. Bryant seeks to contradict this finding by attempting to construe its denial of wage increases to the faculty at the Buffalo campus in July 1988 as proof that Bryant had discretion, as in *Katz* and *Acme*, as to timing and criteria with respect to such wage increases, and that faculty members at the Buffalo Campuses could therefore not have come to rely on and expect these periodic increases.

Although Bryant relies on *Acme I/II* to persuade this Court to deny enforcement because the Board has not fashioned an ap-

propriate standard for determining when a wage increase policy is "discretionary" as opposed to "fixed and automatic," we are not bound by the D.C. Circuit's precedent, and we have not yet determined the question. Moreover, the facts of this case do not require us to directly confront that issue.

Bryant's attempt to characterize the timing and criteria aspects of its wage increase policy as discretionary is thin. The ALJ and the Board relied on substantial evidence to support their conclusion that Bryant's wage increase policy was "fixed and automatic."

While this case facially resembles *Acme* (which again is not controlling), it is actually more similar to *Daily News*. Here, as in *Daily News*, the Union specifically asked the employer not to freeze wage increases.[1] However, Bryant attempts to distinguish this case from *Daily News* on the basis of its contention that the Board's true holding is that Bryant's wage practice is fixed only with respect to time, but is discretionary as to both amount and particularly criteria. Therefore, Bryant claims, if only the timing of Bryant's wage increases is fixed, *Daily News* compels a finding that Bryant's wage increases were required to be frozen. Bryant is mistaken.

Adopting the ALJ's findings and conclusions, the Board found that wage increases were regularly given, and that the amount of each increase was tied to the faculty member's annual performance evaluation. The Board therefore found that there is a fixed criteria for determining wage increases. In so finding, the Board acknowledged an "economic conditions" exception which Bryant now attempts to use to distort the fixed nature of the criteria element. This must fail. The exception is just that—an exception—a practical and narrowly focused exception to the norm, the norm being a fixed and automatic wage increase policy with respect to time and criteria. The exception does not eradicate the norm.

1. Aside from negating the statutory defense that the parties had agreed otherwise, this *"Katz-waiver"* neutralizes Bryant's concern that the Union might bring unfair labor practice charges alleging that Bryant had not negotiated as to the procedures and criteria for determining such increases and, therefore was in violation of the Act because such action was "tantamount to an outright refusal to negotiate on that subject." *Katz*, 369 U.S. at 746, 82 S.Ct. at 1113.

Accordingly, we agree that Bryant's suspension of the discretionary merit wage increases constituted a unilateral change in the terms and conditions of employment in violation of Sections 8(a)(1) and (5) of the NLRA,[2] and affirm the Board's remedy that Bryant make restitution to its employees for back wage-increases.

E. *Whether Bryant Failed to Bargain in Good Faith*

 The Union alleged that Bryant violated Sections 8(a)(1) and (5) and (8)(d) of the Act by failing to meet at reasonable times to engage in collective bargaining and that Bryant engaged in surface bargaining.

The Board adopted the ALJ's holding that Bryant failed to bargain in good faith from January 22, 1990 to March 12, 1991 in violation of Sections 8(a)(1) and (5) and 8(d) of the Act. The Board found that during this period Bryant "engaged in a calculated course of conduct designed 'to render contractual agreement an impossibility' and to 'erode support of the Union among employees.'" *Bryant & Stratton I*, 1996 WL 482931, at *67 (quoting *Smyth Mfg. Co.*, 247 N.L.R.B. 1139, 1167, 1980 WL 11150, at *50 (N.L.R.B. Feb. 19, 1980))(alteration in original). The Board further found that "[e]fforts made by the Union to engage in meaningful discussions [were] at times met by [Bryant's] dilatory tactics attempting to thwart the finding of common grounds for agreement." *Id.*

Section 8(d) of the Act requires the parties to "meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement." This requirement has been interpreted as establishing a general duty between an employer and its employees' bargaining representative "'to enter into discussion with an open and fair mind, and a sincere purpose to find a basis of agreement.'" *N.L.R.B. v. Herman Sausage Co.*, 275 F.2d 229, 231 (5th Cir.1960) (quoting *Globe Cotton Mills v. N.L.R.B.*, 103 F.2d 91, 94 (5th Cir.1939)).

The proceedings below considered Bryant's actions "both away from and at the bargaining table, including the substance of the proposals on which [it had] insisted" in order to determine if Bryant met its obligations under the Act. *See N.L.R.B. v. Overnite Transp. Co.*, 938 F.2d 815, 821–22 (7th Cir.1991) (holding that employer engaged in surface bargaining despite the fact employer had attended six bargaining sessions with union, commented on proposals, offered counterproposals, and maintained bargaining stance that had at least some merit, because vice president of employer expressly stated that employer would not sign contract with union, openly threatened to shut down terminal in order to defeat union, and implied that employer would force strike situation and permanently dismiss those employees who left to join picket lines).

We find that substantial evidence supports the finding of the ALJ and the Board that Bryant violated Sections 8(a)(1) and (5) and (8)(d) of the Act by failing to bargain in good faith.

The parties met sixteen times between January 22, 1990 and March 12, 1991. However, the evidence shows that Bryant failed to meet its procedural obligations under Section 8(d) of the Act by failing to meet at reasonable times to negotiate with the Union. Bryant refused the Union's repeated requests to meet on weekends or to have consecutive meetings. On the one occasion when consecutive meeting days were scheduled, Bryant cancelled the second meeting day claiming it was unprepared.

Instead, Bryant grudgingly made itself available for approximately one day per month, and even that minimal commitment required much urging by the Union. Bryant also would only agree to meet in the late afternoon, after school. Consequently, several of the meetings were hurried. The first meeting lasted only thirty minutes. The second meeting was between fifteen to twenty minutes long. Yet another lasted an hour. Two more, an hour and a half. Four more

---

**2.** Because the Board found that Bryant's wage freeze violated Section 8(a)(5) of the NLRA, the Board found it "unnecessary to pass upon the judge's alternative finding that the wage freeze also violated Sec. 8(a)(3) as that finding would not materially affect the remedy." *Bryant & Stratton I*, 1996 WL 482931, at *1 n. 4.

had an average duration of two and one half hours. Some meetings were ended abruptly by Bryant without explanation. Four of the meetings ended because the Bryant negotiator announced he had to catch a plane.

The ALJ and the Board found that these facts not only support UAW's allegation of surface bargaining in violation of Section 8(d) of the Act, but also constitute an independent violation of NLRA Section 8(a)(5) for "refus[al] to bargain collectively." We agree.

Objective evidence also shows that Bryant demonstrated a consistent unwillingness to provide counterproposals in a timely manner. The Union presented its first package of proposals to Bryant on February 28, 1990. On May 25, 1990, Bryant offered a limited response involving proposals on "management rights" and "no strike." It was not until July 6, 1990, four-plus months after the Union presented its proposals, that Bryant presented its first package of multiple proposals, and those proposals did not respond to the Union's proposals. Bryant did not offer counterproposals to the Union's proposals concerning working conditions, faculty area, substitute teachers, attendance, health and safety, and hours of work and assignments until February 11, 1991, over one year after negotiations began.

The evidence also shows that Bryant was frequently unprepared for negotiations as it regularly claimed it did not have sufficient time to prepare, and on one occasion seemed unfamiliar with the Union's proposals to the degree that it was unable to discuss the proposals meaningfully.

Bryant claims that it could not provide counterproposals sooner because it needed clarification or information from the Union regarding several issues. Bryant's excuses are unsupported by the record. The record shows that, in most instances, Bryant never asked questions of the Union to obtain the information it claims it needed, and that, in fact, Bryant did not satisfy its own statutory bargaining obligation to provide relevant information to the Union in a timely manner.

Furthermore, Bryant often took bargaining positions with respect to issues concerning vacancies, promotions, and seniority that were inconsistent with statements it made at negotiations. In one case, Bryant's explanation for such an inconsistency was that it wanted to "get the Union off [its] back." The ALJ and the Board found this statement to strongly support the conclusion that Bryant was acting disingenuously.

In addition, the finding below that Bryant failed to bargain in good faith is supported by the testimony of Kevin Crosby and John Burke, two ex-employees of Bryant, which established that Bryant's bargaining strategy was to engage in conduct that would undermine the Union and lead to its decertification. Burke was formerly Academic Dean at one of the campuses. Crosby had been the Director of Educational Services at another campus.

Burke testified that the Institute Director for Bryant explained to him that Bryant's strategy was to meet once a month, to drag out the negotiations and avoid reaching an agreement so as to promote faculty dissatisfaction with the Union's performance as the employees' bargaining representative.

The testimony also revealed that Bryant's unilateral suspension of faculty review-based wage increases was intended to be used as leverage during negotiations with the Union. The Board has previously found such strategy to be bad-faith bargaining destructive of employee rights. *N.L.R.B. v. United Aircraft Corp.,* 490 F.2d 1105, 1109–10 (2d Cir. 1973).

Further evidence that Bryant acted obstreperously and engaged in surface bargaining is found in its statement that the Union would have to convince it that a union shop was necessary, and in its proposals that it should have the right to unilaterally make changes in accreditation standards and in the faculty evaluation system.

Thus, there is substantial evidence to support the Board's determinations that Bryant did not bargain in good faith, which determinations are accorded deference under the law. *See N.L.R.B. v. Insurance Agents' Int'l Union,* 361 U.S. 477, 498, 80 S.Ct. 419, 432, 4 L.Ed.2d 454 (1960) ("Board has been afforded flexibility to determine ... whether a party's conduct at the bargaining table

evidences a real desire to come into agreement."); *Glomac Plastics, Inc. v. N.L.R.B.*, 592 F.2d 94, 98 (2d Cir.1979)(hereinafter "*Glomac Plastics I* ") (noting that the Board has particular expertise in making that determination, which this Court "will not lightly disregard").

As was determined below, it is clear from the record that Bryant's focus was more "on the prospect of a termination of its bargaining obligation through the Union's loss of the faculty members support than on the successful negotiation of a collective-bargaining agreement .... [and its] representatives frequently referred to the slim margin of the Union's majority and [Bryant's] belief that the Union lacked faculty support for its demands."

Bryant takes a stab at the credibility of Crosby and Burke by attempting to show that the Board erroneously relied on the "mischaracterized" testimony of two disgruntled former employees who had been fired. Bryant's selective parsing of the transcript in its brief is itself a flagrant attempt at mischaracterization. Our reading of the transcript as a whole reveals that Crosby and Burke were directly told certain statements about Bryant's intent, while other statements of understanding were inferred or generally known to persons in their elevated position within the company. Bryant fails to provide any basis for overturning the Board's credibility findings. *See Kinney Drugs, Inc. v. N.L.R.B.*, 74 F.3d 1419, 1427 (2d Cir.1996) (holding that credibility findings upheld unless "hopelessly incredible"). Likewise, Bryant has failed to undermine any of the other evidence upon which the Board based its findings and conclusions.

Consequently, we affirm the Board's findings that Bryant violated Sections 8(a)(1) and (5) and (8)(d) of the Act by failing to meet at reasonable times to engage in collective bargaining, and that Bryant engaged in surface bargaining.

F. *The Remedy to Extend UAW's Certification and Bryant's Subsequent Withdrawal of Recognition of UAW's Certification*

■ Hearings were held before the ALJ from November 13 through December 13,

1990 (at which time the hearing was adjourned pending further investigation of amended and additional charges), and on various dates from December 3, 1991 through March 30, 1992. The ALJ rendered his decision more than two years later, on June 23, 1994.

Bryant contests the appropriateness of the Board's adoption of the remedy prescribed by the ALJ ordering Bryant to bargain with the Union as if its initial certification had been extended for one year. Bryant contends that this ruling was erroneous in light of the fact that the parties negotiated in good faith to impasse, as determined by the NLRB's Regional Director in Buffalo, for a full year from March 1991 through July 1992. This period was subsequent to the unfair labor practice complaints and prior to the entering of the ALJ's decision.

On January 11, 1993, eighteen months prior to the issuance of the ALJ's opinion, Bryant informed the ALJ of the Regional Director's decision via a Motion to Supplement the Record. According to Bryant, the ALJ ignored this evidence and did not rule on it. The Board made reference to it in a footnote in its Decision and Order dated August 23, 1996; but Bryant contends that the Board merely stated that it was not "bound" by the Regional Director's impasse determination, and that the Board adopted the remedy prescribed by the ALJ without further consideration. *Bryant & Stratton I*, 1996 WL 482931, at *1 n. 5. That, however, was not the case.

In ordering the certification extended, the Board made clear that it considered and rejected Bryant's argument when it stated in its decision "that a 1–year extension of the Union's certification year is necessary to effectuate the purposes of the Act and to allow the Union a reasonable period of time for good-faith bargaining free from the influences of the unfair labor practices previously committed by [Bryant]." *Id.*

We have often found that when an employer fails to bargain in good faith during the certification year, the Board may extend the certification year and require the employer

to bargain for an additional period. *See N.L.R.B. v. Star Color Plate Serv.*, 843 F.2d 1507, 1509 (2d Cir.1988); *Glomac Plastics, Inc. v. N.L.R.B.*, 600 F.2d 3, 4 (2d Cir.1979) (per curiam) (hereinafter *"Glomac Plastics II"*); *N.L.R.B. v. Patent Trader, Inc.*, 426 F.2d 791, 792 (2d Cir.1970) (en banc).

Moreover, Bryant misunderstands the significance of the Regional Director's narrow determination. On or about June 12, 1992, the Union charged that Bryant unilaterally changed the faculty guide and the employees' medical coverage. The Regional Director dismissed the complaint because he determined that a valid impasse had been reached in negotiations concerning those two issues. Bryant claims that the dismissal demonstrates that the parties must have engaged in good faith bargaining for at least one year prior to that date.

 Even if the Regional Director's determination is fully credited (although, as the Board pointed out, "the General Counsel's exercise of his prosecutorial discretion not to issue a complaint is not binding on the Board in its disposition of a separate related case" at *1 n.5 (citing *R.E. Dietz Co.*, 311 N.L.R.B. 1259, 1993 WL 304365 (N.L.R.B. Aug. 9, 1993))), the Board has broad remedial authority to direct the parties to "take such affirmative action ... as will effectuate the policies of this [Act]," 29 U.S.C. § 160(c), subject only to limited judicial review, *Fibreboard Paper Prods. Corp. v. N.L.R.B.*, 379 U.S. 203, 215, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964).

Therefore, regardless of whether Bryant bargained in good faith on two narrow issues for a one-year period (without deciding whether it did so or not), it was in the Board's discretion to order another year of good-faith negotiation. The Board's explanation of its ruling indicates its belief that Bryant tainted the earlier negotiations in general by its use of unfair labor practices undermining the Union's support among its members.

There is a strong policy reason to enforce the Board's order. To deny enforcement would give an employer an incentive to engage in bad-faith bargaining until it undermines the Union's support. After a protract-ed period, the employer could then appear to engage in arguably good-faith bargaining, leading either to a more favorable contract than the employer could have obtained from a Union in a stronger position, or employee disaffection with the Union.

Accordingly, we hold that the Board's order extending UAW's certification for one year was appropriate and well within its remedial authority.

On April 19, 1996 Bryant withdrew recognition from UAW, and thereafter refused to comply with the Union's request to provide information concerning terms and conditions of the employment of unit employees. On August 23, 1996, the Board extended UAW's certification for one year from the date of compliance with the Board's Decision and Order. The General Counsel acted on the Union's charges concerning withdrawal of recognition by filing a complaint alleging that Bryant violated Sections 8(a)(5) and (1) of the NLRA. Bryant's answer stated that it withdrew recognition after receiving signed declarations from twenty-two of the thirty-five bargaining unit members unambiguously indicating that they no longer wished to be represented by the Union.

The General Counsel filed a motion for partial summary judgment on the ground that Bryant's actions violated Sections 8(a)(5) and (1) of the Act, as a matter of law, because the NLRB's determination in *Bryant & Stratton I* meant that the requisite one-year period of good-faith bargaining following the Union's certification had not elapsed. Bryant argues that its asserted good-faith bargaining from March 1991 through August 1992 made extension of the certification year unnecessary.

The NLRB issued a Decision and Order finding that Bryant had committed the charged violations and granted the General Counsel's motion for summary judgment. *Bryant & Stratton II*, 1997 WL 174369, at *3. The Board ordered Bryant to cease and desist from engaging in any further unfair labor practice acts or from interfering with, restraining, or coercing employees in the exercise of their rights under Section 7 of the Act, 29 U.S.C. § 157. *Id.* The order further

required Bryant to collectively bargain in good faith upon UAW's request, put into writing and sign any agreement reached on terms and conditions of employment, and furnish the Union with information relevant to its role as the exclusive bargaining agent of the unit employees. *Id.* at *3–4. The initial year of certification was reset to begin upon the date Bryant began compliance with the NLRB's order. *Id.* at *3.

In its petition for review, Bryant contests the Board's finding that it violated Sections 8(a)(5) and (1) of the NLRA by withdrawing recognition from UAW and refusing to provide relevant information requested by the Union. We hold that the Board's finding was appropriate as a matter of law. Accordingly, we grant enforcement of the Board's order.

Absent unusual circumstances, an employer is obligated to recognize and bargain with a validly certified union for a reasonable period, ordinarily one year following certification, regardless of any changes in the majority status of the union. *Brooks v. N.L.R.B.*, 348 U.S. 96, 98–104, 75 S.Ct. 176, 178–82, 99 L.Ed. 125 (1954). The only unusual circumstances that have been recognized as changing this obligation are the dissolution of the certified union, radical fluctuation in the size of the unit within a short period, or the expiration of a collective bargaining agreement with a duration of less than one year. *Id.* at 103–04, 75 S.Ct. at 181–82. *See also Star Color Plate Serv.*, 843 F.2d at 1509. Accordingly, an employer may not withdraw recognition from a union prior to the expiration of the certification year. *Brooks*, 348 U.S. at 103, 75 S.Ct. at 181; *N.L.R.B. v. Accurate Web, Inc.*, 818 F.2d 273, 275 (2d Cir.1987). During the certification year, the union enjoys a conclusive presumption of majority support. This presumption promotes stability of the bargaining relationships enabling the union to concentrate on obtaining a collective bargaining agreement without worrying about the immediate risk of decertification, and removes any temptation on the employer's part to avoid good-faith bargaining in an effort to undermine union support. *See Auciello Iron Works, Inc. v.*

*N.L.R.B.*, 517 U.S. 781, 785–87, 116 S.Ct. 1754, 1758, 135 L.Ed.2d 64 (1996).

By extending UAW's certification for one year in *Bryant & Stratton I*, the Board also extended the conclusive presumption of majority support throughout the extension period. In such circumstances, the union's majority status is beyond challenge until the extended certification period ends. *See Star Color Plate Serv.*, 843 F.2d at 1509; *Glomac Plastics I*, 592 F.2d at 100; *Patent Trader*, 426 F.2d at 792.

Bryant relies on *Albany Steel* to assert that an employer may rebut the presumption of a union's continuing majority support and withdraw recognition of the union if it can show either that the union in fact no longer had the support of a majority of the unit employees at the time the employer withdrew recognition, or that the employer had a reasonable good-faith doubt as to the union's continued majority status. This proposition is simply irrelevant to this case, however, as Bryant does not deny that if UAW's certification was lawfully extended for another year then the Union continued to enjoy an irrebuttable presumption of majority status. Bryant contends, however, that the extension was not valid and that it is entitled to a hearing to determine whether a causal connection existed between the unfair labor practices found by the Board in *Bryant & Stratton I* and the Union's alleged loss of majority support. Bryant is wrong.

The Board's decision in *Bryant & Stratton II* rests upon the undisputed fact that Bryant withdrew recognition from the Union prior to the expiration of the extension of the certification year that the Board ordered in *Bryant & Stratton I*. In *Bryant & Stratton I*, the Board reasonably found that any bargaining subsequent to March 12, 1991, the date through which the complaint had alleged bad-faith bargaining, was irrelevant to the Board's determination of an appropriate remedy for Bryant's bad-faith bargaining. *See Glomac Plastics II*, 600 F.2d at 4 (enforcing bargaining order and extended certification year to remedy surface bargaining, despite employer's offer to prove that it had engaged in good-faith bargaining prior to Board's decision). Thus, any bargaining in the period

immediately following Bryant's extensive unfair labor practices did not occur in a context free from the influences of its unremedied unfair labor practices.

Consequently, Bryant was obligated to comply with the Board's order in *Bryant & Stratton I* to extend the Union's certification and the consequences flowing therefrom, including recognizing the conclusive presumption of Union majority support, until such time as an appeal reversed the Board's determination regarding the remedy. Cases relied on by Bryant, such as *Lee Lumber & Bldg. Material Corp.*, 322 N.L.R.B. 175, 1996 WL 523011 (N.L.R.B. Sept. 6, 1996), *aff'd in part, remanded in part*, 117 F.3d 1454 (D.C.Cir.1997) and *Master Slack Corp.v. Amalgamated Clothing and Textile Workers Union*, 271 N.L.R.B. 78, 1984 WL 36573 (N.L.R.B. June 29, 1984), which address the analysis appropriate for finding causation between unfair labor practices and erosion in employee support for the union, are inapplicable because those cases apply in circumstances where an employer is not precluded, under certification-year principles, from withdrawing recognition based on a good-faith doubt of the union's majority status.

As stated above, we hold that the Board's order in *Bryant & Stratton I* extending UAW's certification for one year was well within its remedial authority. Because we find that the Board correctly decided that Bryant improperly withdrew recognition from the Union, the Board's orders in *Bryant & Stratton II* are also appropriate. Accordingly, we grant enforcement of the court's orders and direct Bryant to extend the Union's certification for one year beginning from the date Bryant commences compliance with this decision.

## III. CONCLUSION

The Board's determinations of the validity of Bryant's actions with respect to requiring use of the sign-in boards, discontinuing its preobservation notification pilot program, and mandating end-of-quarter assignments, are supported by substantial evidence on the record and are affirmed. Likewise, the Board's determinations that Bryant violated the Act when it unilaterally froze wage increases and otherwise failed to negotiate in good faith are also substantially supported by the record and the law and are affirmed. Accordingly, we enforce both orders of the Board in their entirety and direct Bryant to make restitution to its employees for back wage-increases and to extend the Union's certification for one year from the date of reopening of negotiations, upon request of UAW and in accordance with the order of the Board.